## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEW MEXICO

RONALD F. ROMERO,

        Petitioner,

        vs.                         CIVIL NO. 1:09-cv-232 RB/DJS

DONNA K. GOODRICH, Warden, Gallup
McKinley Adult Detention Center, and
PUEBLO OF NAMBÉ,

        Respondents.

## MAGISTRATE JUDGE'S PROPOSED FINDINGS
## AND RECOMMENDED DISPOSITION[1]

By Order of Reference [Doc. 5], filed March 17, 2009, this matter was referred to Magistrate Judge Don J. Svet to conduct hearings as warranted, and to perform any legal analysis required to recommend an ultimate disposition of the case. The Court recommends that: (1) the *Petition for Writ of Habeas Corpus Pursuant to 25 U.S.C. § 1303 for Relief from Indian Tribal Court Conviction and Order of Detention* [Doc. 1] be **GRANTED**; (2) the sentence of the Nambé Pueblo Tribal Court be vacated and set aside; (3) the parties be required to advise the Court of the current status and circumstances of Petitioner Romero's confinement so that it can be determined if release is appropriate; and (4) the Motion to Dismiss [Doc. 11] be denied as moot.

## I.    BACKGROUND

### A.    Factual Background

The following facts appear from the pleadings and record before the Court.

---

[1]Within fourteen (14) days after a party is served with a copy of these proposed findings and recommendations, that party may, pursuant to 28 U.S.C. § 636(b)(1), file written objections to such proposed findings and recommendations. A party must file any objections within the fourteen-day period allowed if that party wants to have appellate review of the findings and recommendations. If no objections are filed, no appellate review will be allowed.

Petitioner Ronald Romero ("Romero") is an enrolled member of the Pueblo of Nambé ("Pueblo"). [Doc. 1, ¶ 1.] On Thursday, February 22, 2007, an officer of the Santa Fe County Sheriff's Department was dispatched to a residence within the boundaries of the Pueblo where Romero reportedly was causing a violent domestic disturbance. [Doc. 11-8 at 1.] Upon arrival, the officer made contact with three females—two juvenile relatives of Romero, and one elderly woman identified as Romero's mother, Mrs. Romero. [Id.] They reported that they were watching television when Romero entered the home, apparently intoxicated, and began demanding money. [Id.] He yelled profanities, and when one of the younger females asked him to leave the residence and to demonstrate respect for his mother, Romero spit in the juvenile's face. [Id.] He then threatened to kill everyone in the house. [Id.] He continued yelling at Mrs. Romero who was standing behind a recliner chair. [Id.] He then shoved the recliner into her, causing her to fall backward; one of the girls caught Mrs. Romero. [Id.] Romero then swung a punch at his mother, missed her, almost hitting the girl in the face. [Id.]

Romero went on a rampage throughout the house, knocking things over and punching holes in the walls. [Doc. 11-2 at 2.] One of the girls ran for the telephone to call for help, but Romero grabbed it and threw it across the room, disabling it. [Id.] He threatened to burn the house down. [Id.] He did not let the victims leave the house, keeping them confined in the living room and pinning one girl against the refrigerator. [Id.] They eventually were able to escape from the house and call for help on a cell phone. [Id.] When the officer arrived, they reported to him they were in fear of lives because Romero was out of control and they thought he would hurt or kill them. [Id.]

The officer took Romero into custody and placed him in handcuffs in the back of the police vehicle. [Doc. 11-8 at 2.] En route to the police department, Romero verbally threatened the officer by stating he would kill the officer and his family once he was released. [Id.]

2

These incidents gave rise to numerous charges.  Romero refused a plea agreement, and on May 30, 2007, was convicted in Nambé Tribal Court after a bench trial before a tribal court judge. [Doc. 1 at 2.]  The Judgment and Sentence [Doc. 1-3 at 2] reflects that he was convicted and sentenced as follows:

| | | |
|---|---|---|
| Count 1: | Battery against a household member | 365 days |
| Count 2: | Assault against a household member | 365 days |
| Count 3: | Assault | 365 days |
| Count 4: | Assault | 365 days |
| Count 5: | Battery | 365 days |
| Count 6: | Assault on a Peace Officer | 365 days |
| Count 7: | Criminal Damage to Property | 365 days |
| Count 8: | Interference with communications | 365 days |
| Count 9: | Criminal Trespass | 365 days |
| Count 10: | False Imprisonment | 365 days |
| Count 11: | False Imprisonment | 365 days |
| Count 12: | False Imprisonment | 365 days |

Counts 7, 9, 11, and 12 ran concurrently with sentences for other counts, but otherwise the sentences were consecutive, resulting in a total term of imprisonment of eight years.  [Doc. 1-3 at 2.]  The Tribal Court also imposed $7,050 in fines and fees.  [Id.]

Romero was held in custody for the entire time between his arrest in February 2007, and his conviction in May 2007.  [Doc. 1 at 5.]  During that time, he appeared for an arraignment and a pretrial conference.  At no time during these proceedings was Romero represented by legal counsel.

On June 15, 1007, Romero appealed the Tribal Court's decision.  [Doc. 10-2.]  On June 23, 2007, he addressed a letter to the Tribal Counsel and the Pueblo of Nambé Governor requesting a retrial.  [Doc. 10-4.]  In the letter, he complained among other things that he had not been read his *Miranda* rights, that he had no legal representation, and that the judge was not impartial.  [Id.]  The Pueblo characterized the letter as an appeal and submitted it to the Southwest Intertribal Court of Appeals ("SWITCA").[2]

The SWITCA upheld Romero's conviction and sentence in a written opinion dated November 7, 2007.  [Doc. 11-4 at 6–8.]  The opinion addressed Romero's right to counsel and *Miranda* claims, and concluded that neither provided grounds for reversing the conviction.  [Id.]

Romero, who was at that time incarcerated in Colorado, filed a *pro se* Petition for Writ of Habeas Corpus in the District of Colorado on November 21, 2008.[3]  The district court entered an order directing Romero to cure deficiencies by either paying the filing fee or filing a motion and affidavit for leave to proceed *in forma pauperis*.  The district court also directed Romero to file an Application for a Writ of Habeas Corpus on the proper form.  [Doc. 1-4 at 1.]  The docket sheet reflects that a money order and a Motion and Affidavit for Leave to Proceed under 28 U.S.C. § 1915 were received from Romero on December 22, 2008.  [Id.]

On December 23, 2008, the district court granted Romero an additional 30 days to comply with the previous Order to Cure Deficiencies.  [Doc. 1-4 at 1.]  However, in December 2008, Romero was relocated from Colorado to a facility in Gallup, New Mexico.  [Doc. 1 at 3.]  Consequently, the District of Colorado's order granting an extension was returned as undeliverable,

---

[2]Pursuant to a Tribal Council resolution, the SWITCA acts as an independent court of appeals for the Pueblo of Nambé.  [Doc. 10-6.]

[3]The case was assigned cause No. 1:08-cv-2539-ZLW.

and on February 2, 2009, the Colorado petition was dismissed without prejudice.  [Id.]

      **B.**    **Procedural Background**

Romero, who is now represented by counsel, filed his *Petition for Writ of Habeas Corpus Pursuant to 25 U.S.C. § 1303 for Relief from Indian Tribal Court Conviction and Order of Detention* [Doc. 1] in this court on March 10, 2009.  Respondents are Donna K. Goodrich, the warden of the Gallup McKinley Adult Detention Center where Romero was incarcerated when the petition was filed, and the Pueblo.

The Court ordered Respondents to answer the petition, and also to provide copies of  "any pleadings pertinent to the issue of exhaustion which was filed by Petitioner in the sentencing and appellate courts, together with copies of all memoranda filed by <u>both</u> parties in support of or in response to those pleadings...[and] all tribal court findings and conclusions, docketing statements and opinions issued in Petitioner's post-conviction or appellate proceedings."  [Doc. 6 (emphasis in original).]  As ordered by the Court, each Respondent filed an answer to the petition.  [Docs. 8, 10.] The Pueblo also filed a Motion to Dismiss.  [Doc. 11.]  Romero responded to the Motion to Dismiss by moving to compel the Pueblo to produce the record and requesting an evidentiary hearing.  [Doc. 12.] Apparently in response to Romero's allegations that the record was incomplete, the Pueblo filed a *Notice of Lodging of Tapes to Records Department* [Doc. 14], simultaneously submitting six[4] audiotapes and copies of eight exhibits from Romero's trial; the Pueblo also filed a reply in support of its Motion to Dismiss [Doc. 13].  Five months later, Romero sought leave to file a surreply. [Doc. 18], and several weeks after that, moved for a status conference [Doc. 22].

## II.    <u>ANALYSIS</u>

---

[4]The Notice states that five audio tapes were submitted, but in fact, the Court received six tapes, with two tapes designated "Tape 2."

### A.       Habeas Corpus Relief under the Indian Civil Rights Act of 1968 ("ICRA")

Romero claims his conviction and subsequent detention violate the Indian Civil Rights Act of 1968 ("ICRA").  ICRA provides that:  "The privilege of the writ of habeas corpus shall be available to any person, in a court of the United States, to test the legality of his detention by order of an Indian Tribe."  25 U.S.C. § 1303.

ICRA embodies two distinct and competing purposes:  on the one hand, it serves to strengthen "the position of individual tribal members vis-á-vis the tribe"; on the other hand, it promotes "the well-established federal policy of furthering Indian self-government."  *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 62 (1978) (citation and internal quotation marks omitted).  To achieve a balance between these two purposes, ICRA extends a number of constitutional protections that otherwise would not be available to Indians within the jurisdiction of the tribe.

"Indian tribes are distinct political entities retaining inherent powers to manage internal tribal affairs."  *Poodry v. Tonawanda Band of Seneca Indians*, 85 F.3d 874, 880 (2d. Cir 1996) (citation omitted).  Because tribes retain powers of self-government that predate the federal Constitution, constitutional limitations applicable to federal and state authority "do not apply to tribal institutions exercising powers of self-government with respect to members of the tribe or others within the tribe's jurisdiction."  *Poodry*, 85 F.3d at 880–81.  In other words, Indian tribes are not bound by the United States Constitution in the exercise of their powers, including their judicial powers.  *Means v. Navajo Nation*, 432 F.3d 924, 931 (9th Cir. 2005).

Congress nevertheless "has plenary authority to limit, modify, or eliminate the powers of local self-government which the tribes otherwise possess."  *Santa Clara Pueblo v. Martinez*, 436 U.S. 49, 56 (1978) (citations omitted).  With the passage of ICRA, Congress did limit tribal authority by imposing some basic constitutional norms on tribal governments.  *Poodry*, 85 F.3d at

6

881.  The Constitutional rights that Indian Tribes must extend to those within their jurisdiction are enumerated in ICRA; the rights are similar—though not identical—to those contained in the Bill of Rights and the Fourteenth Amendment.  *See* 25 U.S.C. § 1302.  Among the most notable distinctions between ICRA and constitutional guarantees "are the absence in ICRA of a clause prohibiting the establishment of religion; the omission of a right to the assistance of counsel for the indigent accused; the absence of a right to a jury trial in civil cases; and the specific limitation on terms of imprisonment and fines."  *Poodry*, 85 F.3d at 882.

To enforce the rights enumerated in section 1302, Congress has authorized habeas corpus relief.  *Santa Clara Pueblo*, 436 U.S. at 60–61.  Habeas relief generally is the sole federal remedy for a violation of ICRA.  *See id.* at 69–70.

With these principles in mind, the Court turns to the issues in this case.

**B.**  <u>**Petitioner's Grounds for Issuance of Writ of Habeas Corpus**</u>

Romero asserts seven grounds for issuing the writ:  (1) the Pueblo violated his Sixth Amendment right to counsel when it tried, convicted, and sentenced him to eight years without benefit of counsel; (2) the Pueblo violated his Fifth Amendment right to due process by appointing the arresting officer to serve as his lay counsel during pretrial plea negotiations; (3) the Pueblo violated his due process rights when it allowed the tribal court judge who presided over his trial and sentencing to participate in plea negotiations; (4) the Pueblo violated his Fifth and Sixth Amendment rights by failing to timely inform him of the nature of the accusations against him and by failing to provide compulsory process for obtaining witnesses in his favor; (5) the Pueblo violated his due process rights by applying conflicting state and tribal codes; (6) the sentence imposed is in excess of the statutory maximum of one year; and (7) the Pueblo deprived him of his Sixth Amendment right to a jury trial.

Several of Romero's claims require him to bridge the gap between the "constitutional" rights contained in ICRA and those guaranteed by the United States Constitution.  For example, although ICRA affords "due process," 25 U.S.C. § 1302(8), the term is construed with regard to the historical, governmental and cultural values of the tribe; it is not always given the same meaning as it has come to represent under the United States Constitution.  *Tom v. Sutton*, 533 F.2d 1101, 1104 n.5 (9th Cir. 1976).  Furthermore, while the Sixth Amendment guarantees a right to appointed counsel, ICRA does not.  *Compare* U.S.Const. amend. VI ("In all criminal prosecutions, the accused shall...have the Assistance of Counsel for his Defence."), *with* 25 U.S.C. § 1302(6) ("No Indian Tribe in exercising powers of self-government shall...deny to any person in a criminal proceeding the right to...*at his own expense* have the assistance of counsel for his defense[.]" (emphasis added)).

To avoid the variances between the rights guaranteed by the Constitution, and the subset of rights afforded by ICRA, Romero argues that the Pueblo has adopted the United States Constitution, along with all the rights and protections contained therein.  Romero's argument is that the Pueblo by resolution dated June 24, 1996, adopted the New Mexico Criminal and Traffic Law Manual, and that such manual contains reference to the United States Constitution.  Thus, according to Romero, the Tribe has adopted the Constitution wholesale and without limitation.  [Doc. 1 at 10.]  Other of Romero's grounds potentially involve mixed questions of law and fact.  For example, he argues that he was not afforded a "meaningful opportunity" to secure retained counsel because he was confined from the time of his arrest until trial.  [Doc. 1 at 5 (Count I).]

He also argues the Pueblo deprived him of his right to a jury trial.[5]  The Pueblo, on the other hand, claims the tribal court judge informed him at his arraignment of his right to jury trial and that

---

[5]ICRA guarantees criminal defendants a trial by jury.  25 U.S.C. § 1302(10).

it attempted to locate counsel to represent him, but that he waived both rights.  [Doc. 11 at 12.]

The Court concludes  that it need not address the question of whether the Pueblo has adopted the Constitution or determine the contours of due process available to Pueblo criminal defendants; nor must the Court address questions of waiver of counsel and jury trial on the spare tribal court record, nor must it resolve disputed questions of fact.  The imposition of an eight-year sentence under the circumstances presented here violates ICRA and is grounds alone to grant the writ.

### C.    Jurisdiction

Respondent Goodrich has notified the Court that there has been a change in Romero's custody: he is no longer housed in New Mexico.  [Doc. 25.]  On or about December 21, 2009, McKinley County released Romero pursuant to a Writ of Habeas Corpus Ad Prosequendum, and he was transported to a Bureau of Indian Affairs correctional facility in Colorado to answer charges of assaulting and injuring a federal officer.  [Id.]  Thus, although Romero was in custody in New Mexico at the time he filed this Petition, he no longer is incarcerated in New Mexico.  This change of custody raises the question of the Court's authority to issue a writ of habeas corpus while Romero is absent from the jurisdiction.

The Court is not aware of any cases specifically addressing the authority to issue a writ of habeas corpus for violations of ICRA when the petitioner is not detained within the court's territorial jurisdiction.  However, when it comes to matters of jurisdictional prerequisites, the court should "conduct the same inquiry under § 1303 as required by other habeas statutes." *Poodry*, 85 F.3d at 890.

According to principles under other habeas statutes, a petition that attacks the execution of a sentence must be filed in the district where the prisoner is confined. *Haugh v. Booker*, 210 F.3d 1147, 1149 (10th Cir. 2000) (holding that petition that attacks execution of sentence under 28 U.S.C.

§ 2241 is filed where prisoner is confined); *see also Zani v. United States Marshals Svc.*, 338 Fed.Appx. 759, 761 (10th Cir. 2009) (holding that district court in Colorado lacked jurisdiction to consider petition under 28 U.S.C. § 2241 where prisoner was incarcerated in Texas).

Romero, however, does not attack the execution of his sentence; rather, he attacks the legality of his detention pursuant to an order issued by a court located in New Mexico, albeit a tribal court. When a petitioner attacks the validity of an underlying a detention order, venue is proper in the state where the detainer was issued. *See Bradshaw v. Story*, 86 F.3d 164, 166 (1996) (28 U.S.C. § 2255 motion, which tests validity of judgment and sentence, is filed in sentencing court). A petition for habeas corpus under ICRA is by definition a means to test the legality of a detention order. 25 U.S.C. § 1303. Furthermore, when a petitioner attacks the validity of a detention order, his presence within the district is not necessary to confer jurisdiction. *Braden v. 30th Judicial Circuit Court of Ky.*, 410 U.S. 484, 500 (1973). The Court thus concludes that, where the tribal entity that issued the order resulting in detention has been properly served, as the Pueblo has in this case, the Court has jurisdiction over the matter, even though the petitioner is incarcerated outside the Court's territorial jurisdiction.

### D.    Exhaustion

The Court now turns to consider the question of exhaustion. The Pueblo concedes that "Petitioner has exhausted his Tribal remedies for issues related to alleged violations under the ICRA[.]" [Doc. 10 at 1.] If this were a case involving a collateral attack on a state court conviction, a concession of this nature normally would permit the Court to conclude that the defense of nonexhaustion had been waived and proceed to the merits. *Odum v. Boone*, 62 F.3d 327, 332 & n.2 (10th Cir. 1995) (holding that, after the Supreme Court decision of *Granberry v. Greer*, 481 U.S.

129 (1987), the defense of nonexhaustion may in fact be waived if the State fails to assert it).[6] Given

the unique status of Indian nations in our constitutional order, however, the question of exhaustion

merits discussion in this case, because it is not readily apparent from the record that Romero has

exhausted the issue of the eight-year sentence.

In the context of a section 2254 petition seeking relief from a state court judgment, the

exhaustion doctrine serves the important purposes of comity and federalism. *McCormick v. Kline*,

572 F.3d 841, 851 (10th Cir. 2009). The doctrine requires that the substance of the claim be "fairly

presented" to the state courts before it can be raised in federal court. *Id.* Regarding tribal courts:

> [P]roper respect for tribal legal institutions requires that they be given a full opportunity to consider the issues before them and to rectify any errors.... The federal policy of promoting tribal self-government encompasses the development of the entire tribal court system, including appellate courts. At a minimum, exhaustion of tribal remedies means that tribal appellate courts must have the opportunity to review the determinations of the lower tribal courts.

*Iowa Mut. Ins. Co. v. LaPlante*, 480 U.S. 9, 16–17 (1987) (internal citation and quotation marks

omitted).

Exhaustion of tribal court remedies generally is a requirement for obtaining habeas relief in

federal court, but it is not an inflexible requirement. *Selam v. Warm Springs Tribal Corr. Facility*,

134 F.3d 948, 953 (9th Cir. 1998). Instead:

> A balancing process is evident; that is weighing the need to preserve the cultural identity of the tribe by strengthening the authority of the tribal courts, against the need to immediately adjudicate alleged deprivations of individual rights.

*United States ex re. Cobell v. Cobell*, 503 F.2d 790, 793 (9th Cir. 1974) (quoting *O'Neal v.*

*Cheyenne River Sioux Tribe*, 482 F.2d 1140, 1146 (8th Cir. 1973)).

In this case, Romero filed a Notice of Appeal, but the Notice of Appeal did not identify any

---

[6]Even if waived or not raised, the Court may raise exhaustion *sua sponte*. *Odum v. Boone*, 62 F.3d 327, 332 & n.2 (10th Cir. 1995).

particular grounds for appeal.  [Doc. 10-2.]  The letter Romero wrote to the Tribal Governor, and which the Pueblo construed as an appeal, complained of the lack of counsel, judicial bias, and the failure to have his *Miranda* rights read to him, among other things.  It did not, however, complain of the length of the sentence.  [Doc. 10-4.]  The SWITCA opinion upholding the judgment and conviction addressed the right to counsel issue and the self-incrimination (*Miranda*) issues, but did not address the length of the sentence, either.  [Doc. 10-5.]

However, the SWITCA was aware that the Tribal Court had imposed an eight-year sentence. [Doc. 10-5 at 1 (noting consecutive sentences amounting to 2,920 days in jail)].  Furthermore, while observing that Romero did not identify any specific grounds for appeal, the SWITCA acknowledged he had appeared *pro se* at trial, and concluded his application should be liberally construed even though he had not provided all the required information for appeal.  [Id. at 2.]  Consequently, the SWITCA independently reviewed the record, but "did not find any...possible bases for appeal" other than the lack of counsel and *Miranda* issues.  Given that the SWITCA acknowledged and accounted for Romero's *pro se* status by performing an independent review of the record, yet found no defect in sentencing, the Court concludes that SWITCA had a fair opportunity to consider the issue despite Romero's failure to specifically raise it.

Alternatively, even if Romero failed to exhaust the sentencing issue, the Court concludes the exhaustion requirement should be relaxed or excused in this case.  When failure to adequately raise issues on appeal can be attributed to lack of effective counsel, exhaustion may be excused, particularly when there has been a fundamental miscarriage of justice.  *Hammon v. Ward*, 466 F.3d 919, 925–26 (10th Cir. 2006).  Given the express language in ICRA limiting the Tribal Court's authority to one-year prison terms, Romero's failure to complain of an eight-year sentence is very likely attributable to the absence of counsel.  Furthermore, the exhaustion requirement must be

balanced "against the need to immediately adjudicate alleged deprivations of individual rights."
*Cobell*, 503 F.2d at 793 (9th Cir. 1974) (quoting *O'Neal*, 482 F.2d at 1146 ). As discussed next,
Romero already has served in excess of two years—more than twice as long as ICRA permits.

     **E.**    **Merits**

     Romero contends the Pueblo violated ICRA when it sentenced him to eight years in jail plus
fines and fees totaling $7,050.  [Doc. 1 at 11–12.]  The Court agrees that an eight-year sentence
violates ICRA under the circumstances presented here.  Because the sentencing issue is dispositive,
the Court does not consider whether the fines and fees violate ICRA, nor any of the other grounds
Romero asserts for granting the writ.

     **1.**    **The meaning of "any one offense"**

ICRA states:

No Indian tribe in exercising powers of self-government shall—

> require excessive bail, impose excessive fines, inflict cruel and unusual punishments,
> and in no event impose for conviction of any one offense any penalty or punishment
> greater than imprisonment for a term of one year and a fine of $5,000, or both.

25 U.S.C. § 1302(7).

     The Pueblo argues the eight-year sentence does not violate ICRA because no sentence for
any individual charge exceeds 365 days.  [Doc. 11 at 14.]  According to the Pueblo, the Tribal Court
Judge determined that the sentences should be imposed consecutively due to Romero's lack of
remorse, failure to take responsibility for his actions, and prior violent history.  [Id.]

     Only a handful of courts have addressed the issue of whether consecutive sentences that in
total exceed the statutory maximum violate ICRA.  In *Ramos v. Pyramid Tribal Court*, the district
court held that consecutive sentences exceeding the statutory maximum did not violate ICRA.
*Ramos v. Pyramid Tribal Court*, 621 F.Supp. 967 (D. Nev. 1985).  The petitioner in *Ramos* was

convicted after embarking on a high speed ride while highly intoxicated.  *Id.* at 969.  He nearly ran

several cars off the road, rammed a patrol jeep, broke through a barricade, and resisted arrest when

he was finally apprehended.  *Id*.  He was convicted of seven offenses and sentenced to over two

years, though no individual sentence exceed the statutory maximum.[7]  In reaching its decision, the

court focused on ICRA's prohibition against cruel and unusual punishment.  *Id.* at 970.  It reasoned

that "the imposition of consecutive sentences for numerous offenses is a common and frequently

exercised power of judges" and did not constitute cruel and unusual punishment.  *Id.*

This Court does not find the reasoning of *Ramos* persuasive support for the Pueblo's position.

ICRA's limitation on fines and imprisonment is in addition to its prohibition against cruel and

unusual punishment.  In other words, a punishment that is not cruel and unusual still may violate

ICRA.  Thus, the *Ramos* analysis is incomplete because it did not address whether the tribal court

exceeded its authority by imposing a sentence in excess of the statutory maximum.

*Spears v. Red Lake Band of Chippewa Indians*, 363 F.Supp.2d 1176 (D. Minn. 2005)

provides a more thorough analysis and is squarely on point.  The petitioner in *Spears* was driving

while intoxicated when he struck and killed a person.  *Spears*, 363 F.Supp. at 1176.  He failed to

stop, notify the police, or render assistance.  *Id.*  After being released from a federal prison term for

involuntary manslaughter, he was prosecuted in tribal court and plead guilty to six charges arising

from the same incident.  *Id.* at 1176–77.  The tribal court imposed consecutive sentences; the net

result was a 30-month sentence.  *Id*. at 1177.  Spears argued, as does Romero here, that the sentence

violated ICRA.

The court in *Spears* found that ICRA's phrase "any one offense" has, in other contexts, been

---

[7]At the time *Ramos* was decided, the ICRA maximum sentence was six months.  *Ramos*, 621 F.Supp. at 970 (citing 25 U.S.C. § 1302(7)).

subject to at least two reasonable interpretations, and is therefore ambiguous. *Id.* at 1178. After reviewing ICRA's history and underlying purposes, the court concluded that in ICRA, the phrase "any one offense" means "a single criminal transaction." *Id*. at 1181. Supporting this conclusion was the conviction that "Congress did not intend to subject tribal court defendants to many years' imprisonment—without any right to publicly funded counsel—under the guise of a statute ostensibly extending the benefits of the United States Constitution." *Id*. The court further reasoned that "separate violations form a single criminal transaction when they are factually and legally intertwined." *Id*. Applying this standard, the court found petitioner's offenses—flight from the scene of the crime, the accident, the DUI, refusal to take a field sobriety test, and the negligent homicide—were factually related and legally intertwined such that they formed a single criminal transaction. *Id*. Accordingly, the 30-month sentence was held to be illegal.

A more recent case also adopted the reasoning of *Spears* and impliedly rejected the reasoning of *Ramos*. *Miranda v. Nielsen*, No. CV-09-8065-PCT-PGR (ECV), 2010 WL 148218 (D. Ariz. Jan 12, 2010). In *Miranda*, the petitioner was convicted of eight counts arising from an incident involving two separate victims. The petitioner chased one victim down the street with a knife. The victim's sister came outside and confronted the petitioner, and the petitioner, who was intoxicated, brandished the knife and threatened the sister as well. *Id.* at *2. The tribal court judge sentenced the petitioner to 910 days of incarceration, with credit for 114 days of time served. *Id.* The petitioner was not represented by counsel at trial.

The petitioner filed a *pro se* petition for habeas corpus relief under ICRA. The court recommended granting the writ, and held:

> In light of the history and purpose behind the passage of ICRA in 1968, the court is
> convinced that Congress did not intend to allow tribal courts to impose multiple consecutive
> sentences for criminal violations arising from a single transaction. To hold otherwise would

15

> expose a tribal court defendant to a lengthy prison term without the protection of
> representation by counsel and other critical constitutional rights....Therefore, like the *Spears*
> court, the court here finds that the phrase "any one offense" in § 1302(7) of the ICRA means
> "a single criminal transaction."

*Id.* at *5. The court further concluded that since the petitioner had served more than one year of her

sentence, she was entitled to immediate release. *Id.* at *1.

In this case, the Pueblo argues that eight consecutive one-year sentences following

conviction of twelve offenses does not violate ICRA. [Doc. 11 at 13–20.] In this regard, the Pueblo

urges the Court to adopt the reasoning of *Ramos*, and to reject the reasoning of *Spears*. The Court

concludes that *Spears* contains the sounder reasoning.

According to the Pueblo, *Spears* is faulty because it mistakenly determined that the term

"any one offense" is ambiguous, and that the mistake was compounded when the *Spears* court failed

to apply canons of statutory construction that favor Tribes. The Court concludes, however, that the

term is ambiguous, and in fact has given rise to controversy and disagreement in other contexts, such

as whether criminal conduct constitutes a single offense for purposes of double jeopardy and the

right to counsel, and whether several petty offenses should be considered a single serious offense

for purposes of the Sixth Amendment right to trial by jury. *See Texas v. Cobb*, 532 U.S. 162 (2001)

(right to counsel); *Codispoti v. Pa.*, 418 U.S. 506 (1974) (right to jury trial for petty offenses);

*Blockburger v. United States*, 284 U.S. 299 (1932) (double jeopardy).

The Pueblo also relies upon a principle of statutory construction that "statutes are to be

construed liberally in favor of the Indians, with ambiguous provisions interpreted to their benefit."

*NLRB v. Pueblo of San Juan*, 276 F.3d 1186, 1191 (10th Cir. 2002) (quoting *South Carolina v.*

*Catawba Indian Tribe*, 476 U.S. 498, 506 (1986)). With due regard for the special position Indian

tribes occupy in the constitutional order, the Court does not understand this rule of construction to

16

mean that every ambiguous term must be resolved in favor of the tribe.  While Congress "intended ICRA to promote the well-established federal policy of furthering Indian self-government," a central purpose also is to "secure for the American Indian the broad constitutional rights afforded to other Americans."  *Santa Clara Pueblo*, 436 U.S. at 61, 62 (citation, brackets, and internal quotation marks omitted).  As aptly stated in *Miranda*:

> The circumstances surrounding the passage of the ICRA clearly demonstrate that in return for alleviating the tribes of the burden of extending every federal constitutional right to its members, Congress intended to significantly limit the sentence that a tribal court can impose.

*Miranda*, 2010 WL 148218 at *5.  In the case of ICRA, though the term "any one offense" may be ambiguous, Congress' intent to extend certain constitutional protections to individual tribe members is clear, and it is a policy on near equal footing with the policy promoting tribal sovereignty and self-government.

The Court thus concludes, as did the court in *Spears*, that the term "any one offense" means "a single criminal transaction."  The Court now turns to consider whether the twelve counts of conviction in this case constitute a single criminal transaction.

### 2. Application to the facts of this case

The record reflects that Romero verbally and physically assaulted three female family members, at least one of whom was a juvenile and another who was elderly.  He also threatened and confined the victims.  During the course of this violent episode, he went on a rampage damaging the house, destroying numerous items of personal property, and ripping out a telephone to prevent the victims from calling for help.  After he was arrested for these actions, he threatened the arresting officer, and the officer's family, with violence and death.

The Court concludes these events constitute a single criminal transaction.  The separate charges primarily arise from a single episode of domestic violence which—though deplorable and

apparently not the first such incident in Romero's history—nevertheless must be considered a single transaction for the purposes of ICRA's sentencing limitations.  The assault on the officer, which occurred upon his arrest for the other crimes, likewise is another facet of the domestic violence event.

Even if the assault on the officer could be considered a separate criminal transaction from the incident occurring inside the home, and thus could support a separate one-year sentence under ICRA, Romero has already served more than two years.  According to the Petition, he was taken into custody on February 21, 2008, and has been incarcerated ever since.[8]  [Doc. 1, ¶ 5.]  Thus, whether these incidents comprise one criminal transaction or two, Romero has been in custody for longer than ICRA permits.

## III.   RECOMMENDATION

The Court recommends that:

1.   the *Petition for Writ of Habeas Corpus Pursuant to 25 U.S.C. § 1303 for Relief from Indian Tribal Court Conviction and Order of Detention* [Doc. 1] be **granted**;

2.   the sentence of the Nambé Pueblo Tribal Court be vacated and set aside;

3.   the parties be required to advise the Court of the current status and circumstances of Romero's detention so it can be determined if release is appropriate; and

4.   the *Motion to Dismiss* [Doc. 11] be denied as moot.

_____
**DON J. SVET**
**United States Magistrate Judge**

---

[8]The Pueblo contends that the correct date is actually February 22, 2008, but otherwise agrees that Romero has been under continuous confinement since February 2008.  [Doc. 10, ¶ 5.]